## Doom v. Vinson, Next Friend.

(Decided November 14, 1922.)

### Appeal from Livingston Circuit Court.

1. Husband and Wife—Alienation of Affections—Evidence—Suffficiency.—In an action for alienation of a husband's affections, evidence held sufficient to take the case to the jury and to sustain the verdict.

2. Husband and Wife—Alienation of Husband's Affections—Instructions.—Where in a wife's action against her father-in-law for alienating her husband's affections there was no plea of parental privilege, and the given instructions authorized a recovery only in the event that defendant acted wrongfully and maliciously, the refusal of an offered instruction telling the jury in substance that

defendant had the right to counsel and advise his son, in good faith, regarding his relations with his wife, and that he was not liable unless he acted wrongfully and maliciously, was not error.

3. Appeal and Error—Review—Admission of Evidence—Right to Complain.—Appellant can not complain of the admission in evidence of a portion of a letter which was first excluded and then permitted to be read on his motion.

4. Husband and Wife—Alienation of Husband's Affections—Evidence Admissibility.—In a wife's action against her father-in-law for alienating her husband's affections, a letter from the defendant to his son stating that plaintiff and her mother had told damn lies on the son's younger brothers and that if they were men the defendant would make pies out of their faces, and containing other statements which, according to plaintiff's evidence, were either false or only partially true, was admissible in evidence.

5. Husband and Wife—Alienation of Husband's Affections—Evidence Admissibility.—In a wife's action against her father-in-law for alienating her husband's affections, what the defendant did to induce his son to live with plaintiff, and what he said to his son to accomplish that purpose, was admissible as a part of the res gestae; but statements made, not to the son but to others in his absence, were self-serving declarations and therefore not admissible.

CHARLES FERGUSON for appellant.

C. H. WILSON for appellees.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

Through her father, Robert Vinson, as next friend, Katie May Doom, an infant, sued her father-in-law, B. T. Doom, for alienating the affections of her husband, Orion Doom. From a verdict and judgment in her favor the defendant appeals.

The facts are these: On June 5, 1920, Katie May Vinson, then an infant about sixteen years of age, and Orion Doom were married, without the consent and against the wishes of his father, B. T. Doom, who was then a widower with several children. On their return from the wedding, Katie May and her husband took up their residence on the farm of B. T. Doom. Katie May looked after the younger children and assisted in the household duties and she and her husband continued to live with B. T. Doom until August 5, 1920, when her husband went to Cairo, Illinois, in search of work. Prior to his departure he told two or three of his friends that he intended to leave his wife, but she was not informed of his purpose. Soon after he left she received from him two letters, one dated

August 8 and the other August 16, which were couched in endearing terms and showed no purpose on his part to abandon her. Before the departure of his son, B. T. Doom told his sister-in-law that Orion was up against a proposition; that Katie May was not fit for him or any other poor boy's wife and that all she cared for was dressing and going. After Orion went away Katie May purchased some articles and charged them to B. T. Doom, but says that she had authority to do so. She also says that while she was in B. T. Doom's home he never treated her with much consideration. Soon after her husband left, she and B. T. Doom had some words and she went to the home of her father. While Orion was in Illinois, B. T. Doom wrote him that Katie May and Miss Vinson had told that Pony, B. T. Doom's young son, had stolen some chewing gum, tobacco and candy from R. H. Smith, and added:

"They are telling dam lies on Ralph and Pony both I wish they were men, I would make pies out of their faces, or get mug fixt one or the other. Orin it looks mity bad the way Katy May done me, the next day after you left she baut $12 dollars worth goods on my credit and $13 the next day she means to dress up."

He concluded the letter with the following:

"I will be at Paducah next Thursday the 26th at the fair if you will meet me there I will tell you all about everything. You ort to wrote to me."

Pursuant to the suggestion contained in the letter, Orion met B. T. Doom in Paducah on August 26. While B. T. Doom says that he never did or said anything to influence his son to leave his wife, he admits that he talked to him about Katie May's having some of his effects in her trunk on the day she left, and further discussed the charge which she had made against Pony. On the following day, Orion wrote his wife that he had decided to leave her forever, as they could not live together after the way she had done his father. He added that she and her mother had told lies on Pony and that they were both liars. In a postscript he said, "All you know is to dress and go and a poor boy like me don't need a woman like that." Some time later Orion sent word to his wife that he wanted to speak to her, and they resumed their marital relations on October 2, when they took up their residence on the farm of Mr. Robert Smith. Katie May says that their relations were very pleasant until Orion went to see his father and that whenever he returned from

a visit to his father, he was cruel and unkind to her. On November 20, Orion again left her and since that time she has made her home with her father. B. T. Doom was permitted to show that he never did or said anything calculated to cause his son to leave his wife. On the contrary, he made plans to provide them with a home and to furnish them with livestock. He did not know in advance of his son's purpose to abandon his wife. He thought merely that his son was going away to look for work and he tried to dissuade him from doing so. After his son's return, he never tried to influence him, nor did he have an opportunity to influence him, one way or the other.

It is first insisted that the evidence was not sufficient to take the case to the jury or to sustain the verdict. In support of this position, it is argued that no witness testified to any word or act on the part of appellant tending to show that he used his influence to persuade his son to leave his wife. On the contrary, he did not know of his son's purpose in the first instance to abandon his wife and tried to keep him from going away. When he met his son in Paducah, he did not discuss his marital relations with him. After his son and his wife were reconciled, he did not see his son or have an opportunity to advise with him on the subject. Notwithstanding all this, however, it does appear from the evidence that he was opposed to, and greatly wrought up over the marriage. Though his sister-in-law says that Katie May performed her duties well and kept the children clean and nice, it is shown that this did not please him but that he complained of the fact that she wanted "everything dolled up," and stated that Orion did not need a woman like that. Though he says he did not know of Orion's purpose in the first instance to leave his wife, it was shown by way of impeachment that he told a witness that Ralph had stated that Orion was going to leave. If Katie May's and Mrs. Vinson's evidence be true, several statements contained in the letter which he wrote to Orion are either false or only partly true. Not only so, but the letter itself showed a hostile and vindictive attitude towards Katie May, even going to the extent of calling her a liar and wishing that she were a man, in order that he might break her face. Immediately following the letter, he and his son met in Paducah, where he promised to tell him "all about everything." Though his son's prior letters were kind and affectionate, he immediately wrote Katie May that he could not live with her

any longer, and assigned as a reason the very facts which had been stated to him by appellant. Not only so, but Katie May says that every time Orion returned from a visit to his father he was abusive and unkind. In addition to all this, it was developed on cross-examination by counsel for appellant that after Katie May and Orion became apparently reconciled, Orion stated to her that he did not come back to live with her but only "to settle that suit." It is rarely possible, in a case like this, to prove that a father actually advised his son, in the presence of others, to leave his wife. The case must be made out by the circumstances. The question is not whether appellant caused his son to abandon his wife but whether he alienated his son's affections from his wife. It can not be doubted that the most potent means that may be employed by a father to accomplish that purpose is to make it appear to the son that his wife was not only inconsiderate of the father, but was circulating a story that the son's little brother was a thief. We therefore conclude that the evidence was not only sufficient to take the case to the jury, but to sustain the verdict.

There is no complaint of the given instructions, but it is insisted that the court erred in refusing an offered instruction telling the jury in substance that appellant had the right to counsel and advise his son, in good faith, regarding his relations with his wife, and that he was not liable unless he acted wrongfully and maliciously. As there was no plea of parental privilege, and as the given instructions authorized a recovery only in the event that appellant acted wrongfully and maliciously, refusal of the offered instruction was not error.

Another contention is that the letter from appellant to his son should not have been admitted in evidence. In this connection, it is insisted that the letter contained a reference to another matter, having no connection with the case and calculated to prejudice the jury. We find, however, that that portion of the letter, when offered by appellee, was excluded by the court, but was subsequently permitted to be read to the jury on motion of appellant. That being true, appellant can not complain of its admission. So far as the remainder of the letter is concerned, it needs no argument to show its relevancy or important bearing on the issues involved.

Another insistence is that appellant was restricted in his effort to show what plans he had made to provide his son and wife with a farm and to equip it with the nec-

essary livestock. We find, however, that this subject was gone into very fully and the only instances in which any of the evidence was excluded were where the witnesses attempted to detail statements which appellant had made to them, not in the presence of his son. What he did to induce his son to live with plaintiff and what he said to his son to accomplish that purpose were admissible as a part of the *res gestae*. Scott, v. O'Brien, 129 Ky. 1; 110 S. W. 261; 16 L. R. A. (N. S.) 742; but clearly statements made, not to the son, but to others in his absence, were self-serving declarations and therefore not admissible.

We find no merit in the other errors assigned.

Judgment affirmed.